**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| HERBERT STURDIVANT, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09CV468 |
| | ) | |
| CITY OF SALISBURY, NORTH CAROLINA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on Defendant's Motion for Summary Judgment (Docket Entry 18). (<u>See</u> Docket Entry dated Sept. 30, 2010; Fed. R. Civ. P. 72(b)(1).) For reasons that follow, said Motion should be granted.

## PROCEDURAL HISTORY

Plaintiff filed a Complaint in this Court alleging that Defendant, his former employer, violated Title VII of the Civil Rights Act of 1964 ("Title VII") by engaging in "discrimination against [him] because of his race" and contravened North Carolina state law by "wrongful[ly] discharg[ing] [him] in that [a positive drug] test [that Defendant identified as the basis for his firing] was not confirmed by a second test, samples or portions thereof were not preserved as required by law and Plaintiff was denied the right to retest a confirmed positive sample." (Docket Entry 1 at 4.) After the completion of discovery, Defendant moved for summary judgment. (Docket Entry 18.)

In support of said Motion, Defendant filed a brief (Docket Entry 19), to which it attached copies of:

A) a "Pre-Employment Drug Testing Acknowledgment," bearing Plaintiff's signature, dated November 30, 2004 (Docket Entry 19-1);

B) Defendant's "Drug Testing Policy" (Docket Entry 19-2);

C) excerpts from Plaintiff's deposition (Docket Entry 19-3);

D) an "Acknowledgment of Employer's Drug and Alcohol Testing Policy," bearing Plaintiff's signature, dated December 6, 2004, (Docket Entry 19-4);

E) a drug test result form as to a sample taken from Plaintiff on September 18, 2007 (Docket Entry 19-5);

F) a drug test result form as to a sample taken from Plaintiff on December 4, 2007 (Docket Entry 19-6);

G) a drug test result form as to a sample taken from Plaintiff on July 3, 2008 (Docket Entry 19-7);

H) a drug test result form as to a sample taken from Plaintiff on December 8, 2008 (Docket Entry 19-8);

I) a "Charge of Discrimination," dated January 5, 2009, that Plaintiff filed against Defendant with the Equal Employment Opportunity Commission ("EEOC") (Docket Entry 19-9); and

J) an affidavit from Rodney Harrison, who described himself as Plaintiff's "direct supervisor" from August 8, 2005, to December 16, 2008, when Harrison fired Plaintiff (Docket Entry 19-10).

Plaintiff responded in opposition (Docket Entry 27) and attached thereto copies of:

A) the cover page, as well as pages 13 and 82, of Defendant's "Human Resource Policy Manual" (Docket Entry 27-1);

B) a memorandum from an employee in Defendant's "Human Resources" department to an employee in its "Risk Management" department, dated March 9, 2009, on the "Subject" of "Post Accident Drug/Alcohol Testing" (Docket Entry 27-2);

C) a memorandum from Defendant's "Risk Manager" to its "City Manager," dated August 11, 2008, regarding "[t]he investigation of the property damage on August 8, 2008, involving Transit Division driver Charles Sherrill," with attachments (Docket Entry 27-3); and

D) Plaintiff's sworn responses to Defendant's Interrogatories, dated October 1, 2009 (Docket Entry 27-4).

Defendant filed a reply.  (Docket Entry 28.)

<u>FACTUAL BACKGROUND</u>[1]

In December 2004, Plaintiff began working for Defendant as a bus driver, a "high risk safety sensitive position."  (Docket Entry 19 at 3 (citing Docket Entry 19-1; Docket Entry 19-2 at 2).)  Given the nature of that position, Defendant's substance abuse policy (to which Plaintiff knowingly acceded (<u>see</u> <u>id.</u> (citing Docket Entry 19-4)) required Plaintiff to submit to alcohol and drug testing under various circumstances, including after an accident to which his

---

[1] As set out below in the Discussion section, at this stage of the proceedings, the Court must view the record evidence in the light most favorable to Plaintiff.  Plaintiff has "accept[ed] the Statement of Facts [in Defendant's summary judgment brief] with the . . . additional Exhibits [attached to his response brief]."  (Docket Entry 27 at 1.)  As a result, in this section and the Discussion section, the undersigned Magistrate Judge will draw the relevant facts from Defendant's summary (Docket Entry 19 at 3-5), as well as the above-cited record materials submitted by the parties.

driving contributed and which required towing of the bus. (<u>Id.</u> (citing Docket Entry 19-2 at 3).)

In December 2008, Plaintiff had a single-vehicle accident that damaged the right rear quarter panel of the bus and punctured the right rear tire, resulting in another bus (operated by a different driver) finishing the route. (<u>Id.</u> at 5 (citing Docket Entry 19-3 at 2); <u>see also</u> Docket Entry 19-10 at 2 (sworn statement by Harrison that Plaintiff's accident "requir[ed] the bus to be taken out of service").) After the accident, Defendant directed Plaintiff to submit to an alcohol and drug test, which he did; that test came back positive for marijuana. (Docket Entry 19 at 5 (citing Docket Entry 19-8).) Plaintiff's supervisor, Harrison, then fired Plaintiff. (<u>Id.</u> (citing Docket Entry 19-3 at 4); <u>see also</u> Docket Entry 19-10 at 2 (sworn statement by Harrison that, "[a]s a result of [Plaintiff's] positive drug screen, [Harrison] dismissed [Plaintiff] as an employee of [Defendant]").)

DISCUSSION

Summary Judgment Standard

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court "may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000). Instead, it "must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the

-4-

facts in the non-movant's favor." <u>Matvia v. Bald Head Island Mgt., Inc.</u>, 259 F.3d 261, 266 (4th Cir. 2001).

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.' Rather, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" <u>Carr v. Deeds</u>, 453 F.3d 593, 608 (4th Cir. 2006) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)) (internal emphasis omitted). Conversely, "[t]he party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" <u>Emmett v. Johnson</u>, 532 F.3d 291, 297 (4th Cir. 2008) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)). <u>See also</u> <u>Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

<u>Race-Based Employment Discrimination Claim under Title VII</u>

To establish race-based employment discrimination under Title VII, a plaintiff may proceed "in one of two ways. First, he may present direct evidence of his superiors' discriminatory intent. Second, he may attempt to satisfy the test specified in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), which allows him

to raise an inference of discriminatory intent by showing that he was treated worse than similarly situated employees of other races." Sterling v. Tenet, 416 F.3d 338, 345 (2005) (internal parallel citations omitted).

Plaintiff does not argue that the record contains direct evidence of racial discrimination, but instead contends that the case should proceed to a jury pursuant to McDonnell Douglas. (See Docket Entry 27 at 3-5.) Under that approach, "a plaintiff first must make out a prima facie case of discrimination." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010). In this context, "the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Ct. of App., 626 F.3d 187, 190 (4th Cir. 2010) (emphasis added).

Plaintiff's Complaint identifies two different events, i.e., Defendant's directive "requir[ing] Plaintiff to take a drug and alcohol test" in December 2008 (Docket Entry 1 at 2-3) and Defendant's action in "discharg[ing]" Plaintiff after that drug test indicated marijuana use (id. at 3), without making clear whether Plaintiff contends one, the other, or both qualify as actionable instances of race-based employment discrimination. (See id. at 3 (alleging that Plaintiff suffered harm due to "practices herein complained of" and that Plaintiff was "adversely affected as a result of . . . Defendant's intentional denial of Plaintiff's

employment rights").)  In his response, however, Plaintiff appears to assert that both the testing and his firing represent bases for Title VII liability.  (<u>See</u> Docket Entry 27 at 2 (contending that exhibits attached to response brief "support Plaintiff's claim of different treatment with regards to his accident and Sherrill's, his comparative"), 3 (claiming that record evidence reflects that "he was fired while other employees who are not members of [his racial group] were retained, under apparently similar circumstances"), and 4 ("Defendant's decision makers have the power and influence to ignore after hours testing for their own unknown reasons which in this circumstance resulted in different treatment for Plaintiff").)  Accordingly, the undersigned Magistrate Judge will treat Plaintiff's Title VII claim as alleging racial discrimination as to Defendant's decisions <u>both</u> to require a drug test after Plaintiff's accident in December 2008 <u>and</u> to fire Plaintiff after that test produced a positive marijuana result.

Courts thus far have not developed a consistent method of analyzing cases of this sort.  For example, in one opinion, the United States Court of Appeals for the Eighth Circuit separately examined the viability of a claim predicated on a drug test requirement and of a claim based on a firing that occurred when the drug test showed positive results:

> Next we consider the claims of Hardy and Randolph, who were each terminated by the City after testing positive for illegal drug use. . . .  <u>To the extent Hardy and Randolph rely on their respective terminations to show an adverse employment action</u>, neither can overcome the City's facially legitimate reason for terminating them: their undisputed use of illegal drugs in violation of the

City's zero-tolerance drug policy.  <u>To the extent they
contend that the drug testing itself was an adverse
employment action</u>, plaintiffs have identified no evidence
from which the jury reasonably could have concluded that
the drug testing was conducted in a racially
discriminatory manner.  Accordingly, we hold that the
district court did not err in granting [judgment as a
matter of law] for the City on their Title VII
discrimination claims.

<u>Tatum v. City of Berkeley</u>, 408 F.3d 543, 550-51 (8th Cir. 2005)

(emphasis added).  However, in a prior case, the Eighth Circuit

(citing an interest in promoting the principles underlying Title

VII) endorsed a perspective that effectively merged a drug-testing

order and a subsequent firing into a single event.  <u>See</u> <u>Landon v.</u>

<u>Northwest Airlines, Inc.</u>, 72 F.3d 620, 625 n.3 (8th Cir. 1995) ("If

[the defendant's] supervisors drug tested [the plaintiff] for

discriminatory motivations, [the defendant] may not invoke its

policy of zero tolerance to justify [the plaintiff's] discharge,

which would be the direct result of the discriminatory action.  To

hold otherwise would invite such behavior.").[2]

---

[2] In an unpublished decision, the United States Court of Appeals for the
Seventh Circuit also seemed to adopt the <u>Landon</u> Court's approach.  <u>See</u> <u>Keys v.</u>
<u>Foamex, L.P.</u>, 264 Fed. Appx. 507, 512-13 (7th Cir. 2008) ("The district court
understood the similarly situated inquiry to require a showing [from the
plaintiff] that another [of the defendant's] employee[s] tested positive for
drugs or alcohol but did not suffer termination.  But this requirement is too
narrow to vindicate the purpose of Title VII.  Under the district court's
reasoning, a discriminatory employer could evade detection by testing – and
terminating – only those employees within [a particular] protected class, leaving
them powerless to establish a prima facie case because of the absence of
similarly situated employees [from outside that protected class who tested
positive for alcohol or drugs].  Far better to require that [a plaintiff]
identify an employee outside of the [plaintiff's] protected class (and under [the
same supervisor]) who [had the same drug/alcohol-test-triggering circumstances]
but did not face a drug or alcohol test.").  However, although the <u>Keys</u> Court
bootstrapped employment termination to an underlying drug test for purposes of
analyzing whether a plaintiff satisfied the "similarly situated" element of the
(continued...)

If the Court treated Defendant's decision to test Plaintiff for alcohol and drugs following his accident in December 2008 and its decision to fire him after that test came back positive for marijuana as discrete employment decisions, Plaintiff could not make out a prima facie case of racial discrimination as to either.

As to his firing, Plaintiff's Title VII discrimination claim fails on the "similarly situated" prong. "[P]laintiffs are required to show that they are <u>similar in all relevant respects</u> to their comparator . . . [, including that they] 'engaged in <u>the same conduct without such differentiating</u> or mitigating <u>circumstances that would distinguish</u> their conduct or <u>the employer's treatment of them</u> for it.'" <u>Haywood v. Locke</u>, 387 Fed. Appx. 355, 359 (4th Cir. 2010)(citing and quoting <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992))). <u>Accord Heyward v. Monroe</u>, No. 97-2430, 166 F.3d 332 (decision without opinion), 1998 WL 841494, at *6 (4th

_____

[2](...continued)
prima facie case, it also followed an earlier published Seventh Circuit decision to separately analyze whether a drug test qualified as an adverse action. <u>See</u> <u>id.</u> at 510-11 ("[T]his court has held that <u>a mandatory drug test is an actionable adverse employment action only if</u> the test 'is not performed in a routine fashion following the regular and legitimate practices of the employer, but [rather] is conducted in a manner that harasses or humiliates employees.' . . . [The plaintiff] has not shown that [the defendant] conducted the testing in a harassing or humiliating manner, as the law of this circuit requires. [The plaintiff] rests instead on the conclusory assertion that because the test was (allegedly) governed by a discriminatory motive it was necessarily harassing and humiliating. But this ignores the adverse employment action requirement of the prima facie case, which must be met before any presumption of discrimination applies. . . . [T]he district court did not err in finding that [the plaintiff's] drug test was not an adverse employment action." (internal citations omitted) (emphasis added) (citing and quoting <u>Stockett v. Muncie Ind. Transit Sys.</u>, 221 F.3d 997, 1001-02 (7th Cir. 2000))). To the extent this Court chose to adopt the Seventh Circuit's standard for when "a mandatory drug test is an actionable adverse employment action," <u>id.</u>, the record does not reflect that Defendant "conducted the testing in a harassing or humiliating manner," <u>id.</u>

Cir. Dec. 7, 1998) (unpublished); <u>Odom v. International Paper Co.</u>, 652 F. Supp. 2d 671, 688 (E.D. Va. 2009), <u>aff'd</u>, 381 Fed. Appx. 246 (4th Cir. 2010); <u>Mahomes v. Potter</u>, 590 F. Supp. 2d 775, 795 (D.S.C. 2008); <u>Holtz v. Jefferson Smurfit Corp.</u>, 408 F. Supp. 2d 193, 206 (M.D.N.C. 2006), <u>aff'd</u>, 242 Fed. Appx. 75 (4th Cir. 2007). In the words of another court, Plaintiff's claim as to his firing falls short on the prima facie case's "similarly situated" element, because Plaintiff failed to "point to one person [of a different race] who had an accident, had a drug test, had the drug test come out positive, and not be [fired]." <u>Carr v. Patrick Metals</u>, No. 3:07CV442, 2009 WL 483167, at *10 (N.D. Ind. Feb. 24, 2009) (unpublished), <u>aff'd</u>, 351 Fed. Appx. 128 (7th Cir. 2009).

Nor could Plaintiff establish a prima facie case based on Defendant's order requiring him to submit to an alcohol and drug test in December 2008 after an accident that disabled his bus.[3] That requirement does not qualify as an "adverse action" for purposes of a Title VII discrimination claim under the standard set by the United States Court of Appeals for the Fourth Circuit. <u>See</u> <u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 378-79 (4th Cir. 2004) ("Congress in Title VII did not want to tolerate invidious discrimination on the part of companies that merely falls short of the ultimate sanction of dismissal. At the same time, the language of the statute requires the existence of some adverse employment action to establish a Title VII violation. The

_____

[3] Plaintiff does not contest that Defendant's policy required drivers to undergo testing after accidents of the sort he had. (<u>See</u> Docket Entry 27 at 1-5.)

statute's wording makes clear that Congress did not want the specter of liability to hang over every personnel decision."); Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999) ("Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment . . . ."); Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) ("Disparate treatment theory as it has emerged in application of . . . Title VII . . . has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating. . . . [T]here are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of . . . Title VII.").[4]

Simply put, "a drug test, . . . performed pursuant to an established company policy, does not rise to the level of an adverse employment action for which the anti-discrimination provision of Title VII . . . provides relief." Thompson v. Exxon Mobil Corp., 344 F. Supp. 2d 971, 982 (E.D. Tex. 2004). Moreover,

---

[4] "The Supreme Court has recently clarified that a different - and less strenuous - standard is used to define adverse employment actions in the retaliation context." Brockman v. Snow, 217 Fed. Appx. 201, 205 n.3 (4th Cir. 2007) (citing Burlington N. & Santa Fe Rwy. v. White, 548 U.S. 53 (2006)). As Defendant has observed, "Plaintiff's Complaint does not allege retaliation specifically" (Docket Entry 19 at 2 n.1); Defendant nonetheless addressed that issue in its summary judgment brief because retaliation "was alleged in [Plaintiff's EEOC] Charge and may be alleged vaguely within his Complaint." (Id.) In its Reply, Defendant correctly noted that Plaintiff's Response to the instant Motion "does not even address Plaintiff's alleged claim for retaliation." (Docket Entry 28 at 4-5.) To the extent Plaintiff ever asserted a claim for retaliation, he thus has abandoned it. See, e.g., Brand v. North Carolina Dep't of Crime Control and Pub. Safety, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004).

-11-

even if requiring a bus driver to take an impairing substance test after an on-the-job accident constituted an "adverse action" for purposes of a Title VII discrimination claim, Plaintiff still would fall short under the "similarly situated" prong of his prima facie case, because the record does not permit a reasonable fact-finder to conclude that Defendant exempted "similarly situated" employees of other races from such testing.

In his Complaint, Plaintiff referenced an incident in which "Sherrill, a Caucasian transit driver, was involved in a similar minor accident . . . [, but] was not required to take a drug test . . . ." (Docket Entry 1 at 3.)[5] Similarly, in his Response to the instant Motion, Plaintiff asserts that evidence "support[s] [his] claim of different treatment with regards to his accident and Sherrill's . . . ." (Docket Entry 27 at 2.) However, as Defendant pointed out in its summary judgment brief, the record reflects that, "during the time [provided for by Defendant's policy] in which [it] could require Mr. Sherrill to submit to testing, [Defendant] had no information that a post accident test was necessary." (Docket Entry 19 at 10 (citing Docket Entry 19-10 at 1-2).) More specifically, when Sherrill notified his (and Plaintiff's) supervisor, Harrison, "that [Sherrill] dipped into a low catch basin . . . [, Sherrill] stated that no one was injured and he did not report any damage having occurred. . . . [Sherrill] also stated the bus was operational and that he was continuing his

---

[5] The parties agree that Plaintiff is African-American. (See Docket Entry 19 at 9; Docket Entry 27 at 4.)

-12-

scheduled route." (Docket Entry 19-10 at 2.) Harrison (and, through him, Defendant) "was not aware there was any damage to the bus [driven by Sherrill] until [more than 48 hours later] when a transit mechanic inspected the bus . . . ." (Id.) Under Defendant's policy, because of the declining relevance of test results obtained well after an accident, "[i]f the alcohol test is not administered within eight hours, or the drug test is not performed within 32 hours, [Defendant] will not attempt to administer the test . . . ." (Docket Entry 19-2 at 9.)[6]

Plaintiff has not addressed this evidence, much less identified record material sufficient to raise a genuine dispute about the existence of these distinctive circumstances surrounding Defendant's failure to test Sherrill for alcohol or drugs. (See Docket Entry 27 at 1-5.) Given such undisputed differences between the situations involving he and Sherrill, Plaintiff has not made out the "similarly situated" element of his prima facie case as to Defendant's decision to require an impairing substance test after his accident in December 2008. See, e.g., Haywood, 387 Fed. Appx. at 359 ("[P]laintiffs are required to show that they are similar in all relevant respects to their comparator . . . [, including that they] 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or

---

[6] Further, the record reflects that, unlike in the case of Plaintiff's accident in December 2008, the incident involving Sherrill did not result in the immobilization of the bus, a distinguishing fact relevant to the triggering of Defendant's post-accident test requirement. (See Docket Entry 19-10 at 2.)

the employer's treatment of them for it.'"(citing and quoting Mitchell, 964 F.2d at 583)).[7]

Indeed, another court reached the same conclusion in an analogous context. See Proffitt v. AK Steel Corp., No. C-1-03-471, 2006 WL 212074, at *5-6 (S.D. Ohio Jan. 25, 2006) (unpublished) ("[The plaintiff] has also failed to show that there were similarly situated . . . employees [outside her age and gender groups] that were treated differently. . . . [The plaintiff] offers the affidavit of Harold Holly . . . that a few months after [the plaintiff's] incident . . . another [of the defendant's] employee[s], Mark Roberts, dropped a coil in the same manner as [the plaintiff] did, but was not sent for drug testing [as the plaintiff was] . . . . [Unlike with the plaintiff's accident, no] other management officials were even present at the time of

---

[7] In his Response to the instant Motion, Plaintiff also vaguely adverted to a "white employee" other than Sherrill mentioned in one of Defendant's internal memoranda. (Docket Entry 27 at 4 (citing Docket Entry 27-2).) That memorandum details the circumstances of Defendant's failure to test Sherrill and summarizes all "chargeable" bus accidents (presumably, accidents sufficiently serious to trigger an alcohol and drug test under Defendant's policy) from January 2006 to January 2009. (See Docket Entry 27-2.) The summary documents that both "white" and "black" drivers received alcohol and drug tests after accidents. (Id.) It also acknowledges that, on two occasions (one of which, presumably, involved Sherrill), "white drivers" did not receive such tests; however, the memorandum notes that those drivers "weren't tested [as] a result of the investigation time exceeding the established policy time frame to test." (Id.) This document thus does not establish that Defendant failed to order testing of a white driver under circumstances that Defendant knew warranted such testing; instead, it reflects that, in addition to Sherrill, a second white driver once avoided testing because Defendant did not confirm that an accident that would trigger testing had occurred until after the deadline for such testing had passed. Accordingly, to the extent Plaintiff seeks to rely on this document to avoid summary judgment, he has not satisfied the "similarly situated" prong of his prima facie case because the exhibit shows that the circumstances of Defendant's failure to test a white driver other than Sherrill also materially differed from the circumstances of Plaintiff's testing in December 2008.

-14-

Roberts' accident . . . and Holly did not tell [a management official] of the accident until the next day, so [the defendant] did not have the opportunity to make a decision regarding the appropriate response to the accident until the day after the accident . . . . [G]iven the time for any possible drugs or alcohol to wear off . . ., the question of whether [a basis existed] for a drug test would have changed . . . . [T]he circumstances surrounding Roberts' accident were not comparable to those surrounding [the plaintiff's] accident.").

    The material differences between the circumstances underlying Defendant's drug-testing decisions after Plaintiff's and Sherrill's accidents also would doom Plaintiff's discrimination claim if the Court adopted the Landon Court's method of treating a drug-testing requirement and a subsequent firing as a single employment action.[8]

---

[8] As previously discussed, in Landon, the Eighth Circuit indicated that, in order to deter employers from using drug-testing to achieve discriminatory ends, courts confronted with Title VII claims of this sort should not employ the seemingly more routine approach of separately analyzing the discrete employment decisions made by an employer (i.e., to require an employee to take a drug test and to fire an employee who tested positive for drugs); instead, the Eighth Circuit required the joint assessment of those two decisions in a manner that precluded consideration of a defendant's policy or practice of firing employees who test positive for drugs (even if applied race-neutrally) in favor of a focus on whether the defendant required the taking of drug tests in a race-neutral fashion. See Landon, 72 F.3d at 625 n.3. That particular policy-based shaping of legal doctrine strikes the undersigned Magistrate Judge as potentially unsound. Employers certainly should neither exempt nor subject persons of a particular race (or color, gender, religion, or national origin) from drug testing; however, it is not clear that, to curb such possible conduct by employers, courts should adopt legal tests designed to facilitate claims under Title VII by employees fired for failing drug tests. Stated another way:  1) a practice of subjecting municipal bus drivers to drug tests after accidents and firing drivers who flunk such tests appears to represent sensible public policy; 2) a municipality that adopts such a policy, but then knowingly fails to require a bus driver to take a drug test after an accident because that driver falls
                                                                (continued...)

Under that approach, Plaintiff's claim would meet the "adverse action" prong of the prima facie test (because loss of one's job clearly qualifies). Moreover, the absence of evidence of employees outside Plaintiff's racial group who tested positive for drugs after an accident, but kept their jobs, would not foreclose the claim under the "similarly situated" prong (because the focus falls on Defendant's enforcement of the testing requirement). However, under that element of his prima facie case, Plaintiff still would have to show that Defendant failed to order alcohol and drug testing of an employee of a different race despite knowing that said employee had an accident that called for testing. For the reasons set out above, Plaintiff's effort to make that showing (i.e., by pointing to Sherrill) fails as a matter of law.

In sum, Plaintiff has not presented sufficient evidence to make out a prima facie case of race discrimination in relation to Defendant's decisions to test him for impairing substances after an accident that disabled his bus and to fire him when that test came back positive for marijuana (whether the Court considers such decisions separately or as one). The Court therefore should enter summary judgment for Defendant on Plaintiff's Title VII claim.

---

[8](...continued)
within a "favored" racial group, has acted wrongfully; 3) that conclusion does not logically compel the view that courts should construe Title VII to provide a ready means for bus drivers from other racial groups who lose their jobs after testing positive for drugs following accidents to recover damages and to secure injunctive relief (such as reinstatement). In this case, however, the Court need not decide whether it would follow <u>Landon</u> because (for reasons set out above) Plaintiff's Title VII claim fails as a matter of law whether or not the Court analyzes Defendant's decisions to test Plaintiff after his accident in December 2008 and to fire him when he tested positive for marijuana as distinct events.

<u>Wrongful Discharge Claim under N.C. Gen. Stat. § 95-232</u>

According to Plaintiff's Complaint, "Defendant, through its agents, denied Plaintiff employment opportunities and contract rights . . . in violation of North Carolina General Statute §95-232." (Docket Entry 1 at 2.) Specifically, the Complaint alleges that Defendant "wrongful[ly] discharge[d] . . . Plaintiff in that [the positive marijuana] test was not confirmed by a second test, samples or portions thereof were not preserved as required by law and Plaintiff was denied the right to retest a confirmed positive sample." (<u>Id.</u> at 4; <u>see also</u> <u>id.</u> at 3 (asserting that Defendant violated N.C. Gen. Stat. § 95-232 because "there was not confirmation of the test, chain of custody was not maintained and Plaintiff had no opportunity to refute the samples").)

North Carolina law recognizes a "wrongful discharge" tort only where an employee "plead[s] and prov[es] that the employee's dismissal occurred for a reason that violates [North Carolina's] public policy." <u>Shoaf v. Kimberly-Clark Corp.</u>, 294 F. Supp. 2d 746, 759 (M.D.N.C. 2003). North Carolina's General Assembly has declared "that individuals should be protected from unreliable and inadequate examinations and screening for controlled substances . . . [and, therefore, has] establish[ed] procedural and other requirements for the administration of controlled substance examinations." N.C. Gen. Stat. § 95-230. The North Carolina statute on which Plaintiff relies for his wrongful discharge claim sets forth those "[p]rocedural requirements for the administration of controlled substance examinations," N.C. Gen. Stat. § 95-232.

-17-

The North Carolina Supreme Court has recognized "that N.C.G.S. § 95-230 is an expression of the public policy of North Carolina." Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 571 (1999). However, it rejected the position that, whenever a violation of the procedural requirements of N.C. Gen. Stat. § 95-232 occurs, "the public policy exception to the employment-at-will doctrine is automatically triggered, giving rise to a claim for wrongful discharge." Garner, 350 N.C. at 571. To the contrary, the North Carolina Supreme Court has made clear that "something more than a mere statutory violation is required to sustain a claim of wrongful discharge under the public-policy exception." Id.

More specifically, "the public-policy exception was designed to vindicate the rights of employees fired *for reasons* offensive to the public policy of this State. This language contemplates a degree of intent or wilfulness on the part of the employer." Id. at 571-72 (internal citations and quotation marks omitted) (italics in original). Stated another way, "[i]n order to support a claim for wrongful discharge of an at-will employee, the termination itself must be motivated by an unlawful reason or purpose that is against public policy." Id. at 572.

In this case, Plaintiff has not even alleged much less presented sufficient evidence to create a triable issue that, in firing him, Defendant was "motivated by an unlawful reason or purpose," id., related to the public policy expressed in N.C. Gen. Stat. § 95-230 (i.e., "that individuals should be protected from unreliable and inadequate examinations and screening for controlled

substances"). Nor has Plaintiff identified any record material that would allow a reasonable fact-finder to conclude that Defendant acted with any "degree of intent or wilfulness," <u>Garner</u>, 350 N.C. at 572, in connection with any of the procedures mandated by N.C. Gen. Stat. § 95-232. To the contrary, the record reflects that Defendant had Plaintiff submit a urine sample at a medical facility and that an independent laboratory performed the testing. (<u>See</u> Docket Entry 19-3 at 20; Docket Entry 19-8.)

Even if one assumed that a violation of the procedures mandated by N.C. Gen. Stat. § 95-232 occurred during the process through which Plaintiff tested positive for marijuana, Plaintiff has failed to point to any evidence that Defendant had any knowledge of any such non-compliance. (<u>See</u> Docket Entry 27 at 1-5.) As a result, Plaintiff cannot survive summary judgment on this claim. <u>See</u> <u>Garner</u>, 350 N.C. at 572-73 ("The forecast of evidence in the instant case, when viewed in the light most favorable to plaintiff as the nonmoving party, shows that defendant violated the Controlled Substance Examination Regulation by failing to utilize an approved laboratory to conduct plaintiff's drug testing. . . . However, plaintiff in this case has failed to forecast any evidence that at the time of plaintiff's testing defendant knew, or even suspected, that [the laboratory it used for the testing] did not qualify as an approved laboratory . . . . [O]n the evidence in the record in this case, plaintiff fails to sustain his claim for wrongful discharge upon defendant's motion for summary judgment.").

Finally, Plaintiff has not presented evidence that violations of N.C. Gen. Stat. § 95-232 took place in this case. As quoted above, Plaintiff's Complaint references five different alleged violations of said statute:

1) the positive result was "not confirmed by a second test" (Docket Entry 1 at 4);

2) "samples or portions thereof were not preserved" (id.);

3) "Plaintiff was denied the right to retest a confirmed positive sample" (id.);

4) "chain of custody was not maintained" (id. at 3); and

5) "Plaintiff had no opportunity to refute the samples" (id.). Each of these allegations lack either evidentiary or legal support.

First, Section 95-232 provides for secondary testing of employee samples when a laboratory initially utilizes a "screening test"; in such cases, "a positive result shall be confirmed by a second examination of the sample utilizing gas chromatography with mass spectrometry or an equivalent scientifically accepted method." N.C. Gen. Stat. § 95-232(c1). The laboratory result documenting Plaintiff's positive result for marijuana reflects that the required "confirmation analyses [was] performed using Gas Chromatography/Mass Spectrometry." (Docket Entry 19-8.) Plaintiff has cited no contrary evidence. (See Docket Entry 27 at 1-5.)

Second, although the statute in question requires a laboratory to preserve a portion of any sample that tests positive for drugs for a period of 90 days, N.C. Gen. Stat. § 95-232(d), Plaintiff has failed to produce any evidence that, in his case, "samples or

portions thereof were not preserved" (Docket Entry 1 at 4). (See Docket Entry 27 at 1-5.) In fact, the record reflects that Plaintiff admitted he had no knowledge as to whether the laboratory "held [his] sample for 90 days" (Docket Entry 19-3 at 19); moreover, Plaintiff "never asked [the laboratory] or [Defendant] for . . . [his] urine sample" (Docket Entry 19-3 at 24).

Third, Plaintiff has come forward with no evidence of any denial of his "right to retest a confirmed positive sample at the same or another approved laboratory," N.C. Gen. Stat. § 95-232(f). (See Docket Entry 27 at 1-5.) In his deposition, Plaintiff complained that Defendant failed to notify him of this right. (See Docket Entry 19-3 at 17.) Plaintiff, however, has cited no authority (in N.C. Gen. Stat. § 95-232 or elsewhere) that the absence of such notice qualifies as a denial of his right to re-testing. (See Docket Entry 27 at 1-5.)

Fourth, Plaintiff's Complaint asserts that Defendant violated Section 95-232 because "chain of custody was not maintained." (Docket Entry 1 at 3.) The statute in question actually only provides that "[an employer] or his agent shall establish procedures regarding chain of custody for sample collection and examination to ensure proper record keeping, handling, labeling, and identification of examination samples." N.C. Gen. Stat. § 95-232(e) (emphasis added). Plaintiff has cited nothing in the record that would support a finding that Defendant (or its agents) lacked such procedures. (See Docket Entry 27 at 1-5.) Moreover, Defendant's policy expressly states that "[c]hain of custody

procedures for sample collection and testing will be utilized to ensure proper record keeping, handling, labeling and identification of samples." (Docket Entry 19-2 at 10.)

Fifth, Plaintiff has provided no evidentiary support for his assertion that he "had no opportunity to refute the samples" (Docket Entry 1 at 3). (<u>See</u> Docket Entry 27 at 1-5.) As noted above, by statute, Plaintiff had the right to request re-testing of the sample that showed a positive result for marijuana within 90 days. <u>See</u> N.C. Gen. Stat. § 95-232(f). Rather than exercise that right, Plaintiff "never asked [the laboratory] or [Defendant] for . . . [his] urine sample" (Docket Entry 19-3 at 24).

Under these circumstances, Plaintiff's state law claim for wrongful discharge premised on alleged violations of N.C. Gen. Stat. § 95-232 fails as a matter of law.

<u>CONCLUSION</u>

For the foregoing reasons, on both Plaintiff's Title VII race discrimination claim and his state law claim for wrongful discharge, Defendant has shown "'that there is an absence of evidence to support [Plaintiff's] case.'" <u>Carr</u>, 453 F.3d at 608 (quoting <u>Celotex Corp.</u>, 477 U.S. at 325).

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry 18) be **GRANTED**.

           /s/ L. Patrick Auld
              **L. Patrick Auld**
       **United States Magistrate Judge**
January 10, 2011